UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
DEBORAH P. MANTELL,

Plaintiff,

COMPLAINT

*(Jury Demanded)*

-against-

THE STATE OF NEW YORK, its agencies, THE UNIFIED COURT SYSTEM OF THE STATE OF NEW YORK and MENTAL HYGIENE LEGAL SERVICE OF THE APPELLATE DIVISION'S SECOND JUDICIAL DEPARTMENT and MICHAEL NEVILLE, EUGENE MYERS, EBEN R. HILL, DAWN MULDER, and GENOVEFFA FLAGELLO,

Defendants.
------------------------------------------------------------------------- X

Plaintiff, Deborah P. Mantell, by and through her undersigned attorney, hereby alleges as and for her Complaint the following:

**PARTIES**

1. Plaintiff, Deborah P. Mantell ("Mantell" or "Plaintiff") is an individual with a residence in the State of New York, and at the relevant times, Mantell was working in Dutchess County or Orange County as an Associate Attorney for the State of New York Mental Hygiene Legal Service of the Appellate Division's Second Judicial Department, an agency or department of the State of New York and the Unified Court System of the State of New York.

2. Defendant, the State of New York (the "State"), is and at all relevant times was a public employer as defined by Section 75-b of the New York Civil

Service Law, which operates the Unified Court System of the State of New York. The Mental Hygiene Legal Service of the Appellate Division's Second Judicial Department ("MHLS") is an agency or department of the Unified Court System, which provides mental health legal services to individuals in the State.

3. The State of New York was at all relevant times Mantell's employer, and, as a public employer, it and its agencies and departments are subject to liability and equitable relief, including reinstatement and related equitable remedies, pursuant to New York Civil Service Law § 75-b and New York Labor Law § 740.

4. Defendant Michael Neville ("Neville") was at times the Director of MHLS and one of Plaintiff's supervisors.

5. Defendant Eugene Myers ("Myers") was at all relevant times the Deputy Director of MHLS and one of Plaintiff's supervisors.

6. Defendant Eben R. Hill ("Hill") was at all relevant times the Deputy Chief Attorney for the Ninth Judicial District (which includes Dutchess, Orange, Putnam, Rockland, and Westchester Counties) within the offices of MHLS and one of Plaintiff's supervisors. After Mantell left, Hill became the Director.

7. Defendant Dawn Mulder ("Mulder') was at all relevant times a Principal Attorney for the offices of MHLS operating in Orange County, and at times, Mulder was one of Plaintiff's supervisors.

8. Defendant Genoffeva Flagello ("Flagello") was at all relevant times a Principal Attorney for the offices of MHLS operating in Dutchess County and was one of Plaintiff's supervisors at the times relevant to this action.

**JURISDICTION AND VENUE**

9. This District Court has subject matter jurisdiction over this action because the claims asserted herein arise under the First and Fifth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10. Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(b)(1) & (b)(2) because the Southern District of New York is where a substantial part of the events or omissions giving rise to the claims occurred and because, upon information and belief, one or more of the defendants reside within the Southern District of New York.

**STATEMENT OF FACTS**

11. Mantell worked successfully as an attorney for MHLS at the First Department and the Second Department for over 16 years.

12. As an attorney working at MHLS, Mantell represented individuals who were alleged to have a mental illness or developmental disabilities and could have their rights to liberty limited by reason of an actual or an alleged mental illness. For example, Mantell represented individuals who had been involuntarily hospitalized as persons who were mentally ill and dangerous, and were seeking to be released from confinement in a psychiatric ward pursuant to legal proceedings under Article 9 of the Mental Hygiene Law.

13. Mantell also represented individuals who had completed a prison sentence for certain sexual offenses but were subjected to civil, post-prison proceedings whereby the State sought to continue their confinement pursuant to proceedings commenced under Article 10 of the Mental Hygiene Law. Other clients were prisoners at the end of prison terms that the State sought to transfer to a State psychiatric facility, or for whom prison health staff sought medication over objection or post-prison court-ordered outpatient treatment.

14. Although Mantell was an employee of MHLS and paid by the State of New York, as an attorney she was required to act in the interests of her clients, as mandated by the New York Code of Professional Conduct, 22 NYCRR Part 1200.

15. For sixteen and one-half years, from September 2008 through her termination on April 4, 2025, Mantell ably and satisfactorily performed her duties and received satisfactory or better annual performance reviews.

16. For the first seven years of her career at MHLS, Mantell worked primarily doing appellate and impact litigation out of MHLS's offices of the Mental Hygiene Legal Service for the First Judicial Department.

17. For the next nine years, Mantell worked primarily doing trials and administrative proceedings out of the MHLS offices within the Second Judicial Department, which includes Westchester, Dutchess, Orange, and Suffolk Counties.

18. Mantell successfully represented her clients while working at MHLS in the Appellate Division's First and Second Departments, and over the course of her career, she secured numerous favorable administrative, trial-court and appellate-

court decisions that established or expanded the law in favor of her clients' interests.

19. All of Mantell's annual performance evaluations for the period from 2008 through 2025 determined that Mantell satisfactorily performed her duties, and over the course of her career, Mantell received promotions from her initial position as Attorney to the title of Senior Attorney in about 2014, and then to the title of Associate Attorney in 2018. Mantell's quarterly performance reviews, following her promotion to Associate Attorney, were also all favorable.

20. In about November of 2024, Mantell applied for a promotion to the position of Principal Attorney for the Westchester and Orange County offices. In order to be qualified for the position as Principal Attorney, an applicant was required to have six years of relevant experience, and Mantell satisfied these requirements for the application.

21. As of November 2024, Mantell was working as an Associate Attorney out of MHLS's Poughkeepsie office, which was then run by Defendant Flagello.

22. Flagello was the Principal Attorney for the Poughkeepsie office, and as such, Flagello was the supervisor for a staff of about two to four lawyers who worked out of that office under the titles of Attorney, Senior Attorney, or Associate Attorney.

23. In November 2024, Defendant Hill temporarily assigned Mantell to work out of the Orange County office to cover for another attorney out on an extended medical leave. For that assignment, Mantell was assigned to handle

Article 9 matters for clients who had been involuntarily committed to the psychiatric wards at Garnet Hospital in Middletown, New York.

24. At that time, the Orange County office was run by Defendant Mulder, and this was the first time that Mantell worked directly for Mulder in Orange County.

25. When Mantell started working for the Orange County office, Mantell learned and became concerned that the Orange County MHLS office had an office-wide practice of initiating Article 9 proceedings by uploading private and confidential information pertaining to its clients on the New York State Courts Electronic Filing ("NYSCEF") system, without taking steps to preserve the client's confidentiality.

26. Pursuant to Mental Hygiene Law § 9.31(f), "[t]he papers in any proceeding under [Article 9] which are filed with the county clerk shall be sealed and shall be exhibited only to the parties to the proceedings or someone properly interested, upon order of the court."

27. In addition, pursuant to Mental Hygiene Law § 33.13(c), records, including information identifying patients, maintained by regulated mental health facilities about patients, "shall not be a public record and shall not be released," unless such release is pursuant to a court order or other specific exception to the general rule of confidentiality for persons alleged to have a mental illness.

28. Furthermore, pursuant to the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 (August 21, 1996) ("HIPPA") and

regulations promulgated under HIPPA, 45 C.F.R. Part 160, *et seq.*, federal law prohibits the unauthorized release of a person's medical information.

29. Mantell initially raised her confidentiality concerns in November 2024 about these unlawful practices with Defendant Mulder, specifically informing Mulder about the confidentiality requirements set forth in the Mental Hygiene Law, about which Mulder was either ignorant or indifferent.

30. Not only did the practice in Orange County violate state and federal confidentiality laws, but the Rules of Professional Conduct, which regulate the conduct of attorneys admitted to practice law in the State of New York, require attorneys to preserve a client's secrets and other sensitive information. Rule 1.6 of the Rules of Professional Conduct, codified as law at 22 NYCRR Part 1200, Rule 1.6, generally provides that a lawyer shall not knowingly reveal confidential information, including information that is likely to be embarrassing or detrimental to the client, and shall make reasonable efforts to prevent inadvertent disclosures of the client's confidential information.

31. Mulder refused to correct the Orange County practices and told Mantell that the practice at the Orange County office was how it was done under previous supervisors and that she was not willing to alter office practices.

32. Upon information and belief, Mulder dismissed Mantell's concerns as a minor or technical matter that did not merit further attention and viewed Mantell and her confidentiality and ethical concerns as an irritation.

33. After Mulder rebuffed Mantell's stated concerns, Mantell raised her concerns about the Orange County practice of filing client information on a public database with Defendant Flagello, who was at the time the Principal Attorney and Mantell's supervisor at MHLS's Poughkeepsie office.

34. Defendant Flagello also failed to address Mantell's concerns about client confidentiality and, upon information and belief, criticized Mantell for being concerned about the issue and for thinking there might be a more appropriate way to request patient hearings.

35. Rather than addressing these confidentiality and ethics issues, Mulder and Flagello wanted Mantell to simply ignore them, which itself was a violation of professional ethics.

36. On January 13, 2025, Defendants Neville, Myers, Hill, Flagello, Mulder, and others interviewed Mantell over Microsoft Teams in connection with Mantell's application for promotion to Principal Attorney in three MHLS field offices.

37. Mantell had previously applied for a promotion to two open positions as Principal Attorney in Orange and Westchester Counties, and after a position for Principal Attorney in the Poughkeepsie office was posted, Mantell also submitted an application for that position as well.

38. Mantell was likely the only MHLS lawyer working in the Poughkeepsie office that would be qualified for promotion to Principal Attorney, and

she was the only applicant for the promotional opportunity at the Poughkeepsie office.

39. After her promotion interview on January 13, and while Mantell was walking in a common hallway area in the Poughkeepsie office, Mantell overheard Mulder and others loudly complaining about Mantell for raising concerns about the process MHLS in Orange County used for initiating Article 9 cases.

40. Mulder stated that Mantell was abrasive for asking her about her familiarity with Article 9, and Flagello stated that Mantell would raise too many issues in her cases and would pursue issues that she should not. The context and other comments by other participants made it clear to Mantell that she was overhearing Mulder and Flagello urging MHLS directors, Neville and Myers, to deny Mantell any promotion because she had spoken up about concerns with office practices and was challenging the status quo.

41. Mantell also heard Neville and/or Myers state that Mantell was the only applicant for the Poughkeepsie promotion, that the position did not have to be offered, and that he (Neville or Myers) would lower Mantell's score, which, upon information and belief, referred to paperwork used for evaluating or ranking promotion applications

42. Later that same month, on or about January 21, 2025, Mantell told Flagello that she was concerned that Mulder was complaining to the directors about how she raised concerns about the Article 9 filing process in Orange County and that these complaints would interfere with Mantell's promotion application, but

Flagello told Mantell that there was nothing Mantell could do but wait for the presiding justice to make his decision.

43. After being rebuffed by Flagello, on or about January 24, 2025, Mantell raised with Hill her concerns that both Mulder and Flagello were sabotaging her promotional opportunities in retaliation for raising privacy concerns about the use of NYSCEF in Orange County, but Hill told Mantell that nothing could be done and she just had to wait for the presiding justice to make his decision.

44. On April 3, 2025, Neville contacted Mantell by telephone while she was at work, then conferenced in Myers and his human resources staff before telling Mantell that she was not receiving any of the promotions, even the Poughkeepsie Principal Attorney position for which Mantell was the only applicant. When Mantell asked if they could discuss why, Neville said that reasons for the determination were confidential and would not be shared with Mantell.

45. In that same conversation on April 3, 2025, Mantell told Neville and Myers that Mantell had overheard Mulder and Flagello disparaging her on January 13, 2025, after Mantell's interview, and that Mantell was concerned that they were sabotaging her promotion applications as retaliation for her complaints about the improper practices at the Orange County office. Mantell also told Neville and Myers that she had previously informed Hill that she (Mantell) was concerned about Mulder and Flagello sabotaging her applications in retaliation for raising her complaints about the Orange County office.

46. Rather than address Mantell's concerns about retaliation, Neville became angry and hostile toward Mantell and effectively accused Mantell of improperly eavesdropping on their January 13 meeting (which was a baseless and false accusation) and proceeded to abuse his authority as a supervisor by conducting a hostile cross-examination-type of interrogation of Mantell about how she was able to hear the supervisors speaking about her. Neither Neville nor Myers addressed or disputed that the denial of the promotional opportunities was retaliatory.

47. After this April 3 conversation ended, Mantell became overwhelmed and began to cry.

48. Embarrassed about crying at work, Mantell decided to leave the office, at least for the rest of the morning, and while she tried to leave unseen, before she got to the back door, Mantell could see that Flagello and two other colleagues could see her, and before walking out the back door, Mantell said to Flagello that she, Mantell, knew what Flagello had done.

49. Later that same day, upon information and belief, Flagello spoke by phone with Neville about Mantell's departure from the office and after that conversation, upon information and belief, Flagello began composing a "workplace violence prevention report" that falsely accused Mantell of engaging in violent or threatening behavior and misused her position as a supervisor to have staff sign false workplace violence complaints against Mantell.

50. Upon information and belief, Flagello also told numerous other persons, including lawyers and support staff, within MHLS that Mantell was being fired or had been fired because of a workplace violence incident.

51. The workplace violence report, which, upon information and belief, was prepared by Flagello, was a false and pretextual excuse for making up grounds for Mantell's planned termination and was prepared and circulated in retaliation against Mantell for raising concerns about the confidentiality and ethical violations by MHLS and for reporting retaliation regarding the promotion process.

52. Upon information and belief, the workplace violence report was created by Flagello and used by Neville, Myers, Hill, Flagello, and others to terminate Mantell because she complained about the unlawful practices in Orange County and because she accused Neville, Myers, Hill, Flagello, and Mulder of retaliating against her, which is itself protected activity.

53. Early in the morning on the next day, Friday, April 4, 2025, Kevin Mahler, the President of the Local Civil Service Employees Association (CSEA), called Mantell and told her that if she did not submit a letter of resignation by 8:00 a.m. the next business day, Monday, April 7, 2025, she would be terminated; at MHLS, whether an attorney is terminated or resigns is information that is promptly distributed by email to all MHLS staff.

54. Mahler also told Mantell that she did not have any right to challenge the termination decision under the Civil Service Law or the Collective Bargaining Agreement because of her classification as a non-competitive and confidential

employee and that if she did not resign and was in fact terminated, Mantell would never be able to secure another position working for the State of New York, a fact which would disqualify Mantell from completing 20 years of State employment that would significantly increase her pension benefits, thereby costing her hundreds of thousands of dollars in lost pension benefits. Mahler also suggested to Mantell that if Mantell were to resign, Mantell's description of her departure as a resignation could help her obtain employment anywhere, including at another Appellate Division agency.

55. On April 4, 2025, before Mantell had decided whether to submit a resignation, the defendants cut off all electronic or physical access that Mantell had to her office. By about 11:00 am., Mantell was locked out of her work email, and, upon information and belief, Appellate Division staff changed the physical locks on the doors to the MHLS Poughkeepsie office. In addition, Hill went through Mantell's papers in her office and boxed up her belongings.

56. Late at night on April 4, 2025 and after Mantell had been locked out of her email account and her office, a coerced Mantell succumbed to the threats by the defendants and emailed an unsigned statement to the MHLS directors, Hill, the HR Director, and Mahler, saying that after speaking with Mahler, she decided it would be best for her to resign from her position as Associate Attorney.

57. On the morning of Monday, April 7, 2025, before Mantell had reached anyone at MHLS to discuss her resignation or whether she should go to her office that day, Mantell was informed that the Appellate Division's security staff/court

officers were on their way to Mantell's home, where they delivered the personal items from Mantell's office that Hill had packed on April 4, 2025. The returned boxes, however, excluded some personal and non-work professional materials of Mantell's that Hill refused to return to Mantell because, according to Hill, the employee handbook forbids employees from engaging in personal matters from their office.

58. Throughout April 2025, Hill and other Appellate Division personnel declined to answer Mantell's requests for an explanation for the reason for her termination, a fact that greatly enhanced Mantell's emotional distress caused by the termination. Rather than respond to her request for information, Hill instead told Mantell that she could take whatever action she felt was appropriate.

59. In May, after Mantell texted a former MHLS Poughkeepsie colleague, Mantell received a phone call from the Appellate Division's Chief of Security falsely claiming that Mantell knew she was forbidden from contacting anyone at MHLS and if she did so again, then they would contact "the authorities." The Chief of Security said he did not know why Mantell was terminated, and he gave Mantell his cell phone number to assist her with efforts to retrieve personal and sensitive information that Hill declined to return to her.

60. Following Mantell's termination, in April, Neville, Myers, and Hill directed all of Mantell's prior MHLS supervisors that if any potential employer contacted them for a reference for Mantell, they were prohibited from speaking about Mantell and must direct the caller to MHLS's human resources staff. These

individuals included Brian Wellington, who was then the Principal Attorney in Suffolk County who was Mantell's supervisor from about 2018 through most of 2021.

61. In January 2025, Wellington had discussed with Mantell how he would be a good reference for Mantell, and subsequently so had Alison Kuhlman, MHLS's Article 10 supervising attorney, who had known Mantell for over a decade. Hill and Myers directed Wellington, Kuhlman, and others that they could not act as a reference for Mantell and that the only person Mantell could name as a job reference was the non-attorney MHLS human resources staff.

62. Since her termination, Mantell has unsuccessfully submitted applications for State employment or reinstatement, and the Defendants have denied Mantell's requests for employment and reinstatement.

63. As a result of her termination, Mantell has lost income, lost valuable pension benefits, has had her good name and standing as an attorney in the field of civil rights and mental health law stained by the stigma of termination for a workplace violence incident, and suffered severe emotional distress and damages.

64. As a result, the Defendants have damaged Mantell's name and reputation, have interfered with her ability generally to secure employment, and interfered specifically with her ability to secure employment with the largest State employer of attorneys, the Office of the Attorney General, where job applicants are asked to provide recent supervisory job references.

65. These adverse actions taken by the Defendants against Mantell on April 3 and thereafter have stigmatized Mantell in the workplace, severely

damaged her career, and caused her to suffer pervasive feelings of humiliation and disgrace.

66. The adverse actions taken by the Defendants against Mantell on April 3, 2025 and thereafter, constitute disciplinary and adverse personnel actions regarding Mantell's employment as an Associate Attorney and were taken against her because she complained about the unlawful practices at the Orange County offices and because she complained that the denial of her promotion was also retaliation.

67. The unlawful adverse actions taken by the Defendants against Mantell include: denying her a promotion to the Principal Attorney position; terminating her employment; denying her access to job references; stigmatizing and damaging her good name and reputation, and creating a hostile work environment.

68. The Defendants' conduct, jointly and severally, has caused Mantell to suffer humiliation and severe mental anguish as a result of the retaliatory actions taken against her.

69. Any conditions or prerequisites to the commencement of this action have been satisfied or do not apply as a matter of law.

**FIRST CAUSE OF ACTION**
**(whistleblower retaliation)**

70. Plaintiff repeats and realleges all the foregoing allegations as if set forth herein at length.

71. The State of New York is a "public employer" within the meaning of Civil Service Law Section 75-b (1)(a).

72. Mantell is a "public employee" and "employee" of the State of New York within the meaning of Civil Service Law Section 75-b (1)(a) in that she held the position as Associate Attorney at MHLS.

73. The actions taken by the Defendants against Mantell on January 13, 2025, April 3, 2025, and thereafter were adverse actions taken because Mantell disclosed to governmental officers and governmental bodies information that Mantell reasonably believed to be true and that Mantell reasonably believed constituted improper governmental action, as that phrase is defined by Civil Service Law § 75-b (2)(a).

74. The adverse actions taken by the Defendants against Mantell on January 13, 2025, April 3, 2025, and thereafter were taken because Mantell disclosed to governmental officers and governmental bodies information about violations of laws, rules and regulations by MHLS.

75. The adverse actions by Defendants were actions taken under the color of state law and in the performance of their official duties as employees of the State of New York.

76. Mantell's retaliation and whistleblower claims are not subject to a final and binding arbitration provision of any collective bargaining agreement, and Mantell is classified in the Non-Competitive/Confidential classification of employment.

77. Mantell's employment is not of a type that would create rights or protections under a collective bargaining agreement or the Civil Service Law, as

provided for is sub-section 3(a) or (b) of Civil Service Law § 75-b, and as such, Mantell is authorized and permitted to commence this action pursuant to sub-section 3(c) of Civil Service Law § 75-b, which provides and authorized such an employee with the right to commence an action against the State pursuant to Labor Law, Article 20-C, § 740.

78. As a result of the Defendants' conduct and actions, Mantell is entitled to reinstatement to her status before April 4, 2025 and is entitled to the promotion to the level of Principal Attorney; full reinstatement remedies, the reinstatement of Mantell's full fringe, employment and pension benefits and seniority rights; compensatory damages for lost wages, lost benefits, lost enhanced pension benefits, damages for severe emotional distress, treatment expenses; and all other forms of lost remuneration; and the payment of reasonable costs, disbursements and reasonable attorney's fees.

**SECOND CAUSE OF ACTION**
**(freedom of speech)**

79. Plaintiff repeats and realleges all the foregoing allegations as if set forth herein at length.

80. The individual defendants, Neville, Myers, Hill, Flagello, and Mulder have taken retaliatory and adverse action against Mantell because she complained and reported on unlawful practices by the Orange County office in violation of Mantell's constitutional rights to speak as a citizen and to petition the government for a redress of her grievances.

81. The unlawful adverse actions taken by the Defendants against Mantell include: denying her a promotion to the Principal Attorney position; terminating her employment; denying her access to job references; damaging her good name and reputation, and creating a hostile work environment.

82. The First Amendment to the United States Constitution and Article 1, Section 8 of the New York Constitution prohibit the individual defendants from retaliating against Mantell because Mantell exercised her First Amendment rights to speak and to petition the government for a redress of grievances.

83. Mantell's speech is protected because she spoke as a citizen on matters of public concern about ongoing and unlawful practices at the Orange County offices at MHLS.

84. The individual defendants are persons within the meaning of 42 U. S. C. §1983, and at all relevant times, they were acting as agents of the State under color of state law.

85. As a result of the individual defendants' conduct, they are jointly and severally liable to Mantell for damages and punitive damages in an amount to be established at trial together with all costs and expenses of this action, including reasonable attorney's fees, pursuant to 42 U. S. C. § 1988.

**THIRD CAUSE OF ACTION**
**(procedural due process)**

86. Plaintiff repeats and realleges all the foregoing allegations as if set forth herein at length.

87. As an employee of the State of New York, Mantell was entitled to procedural due process, and the Defendants violated her rights to due process.

88. Under established and maintained contractual rights that are recognized property rights protected by the due process clauses of the Fifth Amendment to the United States Constitution and Article 1, Section Six of the New York State Constitution, an employee such as Mantell has the contractual right and opportunity to respond to every statement concerning her work or conduct, the contractual right to examine any such statements, and the contractual right to have at least five business days' written notice of termination in which to respond to such statements.

89. These contractual rights are property rights protected by the due process clauses of the United States and New York State Constitutions.

90. The individual defendants, jointly and severally, denied Mantell the right and opportunity to notice and an opportunity to be heard before her termination on April 4, 2025, in violation of the due process clauses of the Fifth Amendment to the United States Constitution and Article 1, Section Six of the New York State Constitution.

91. The individual defendants are persons within the meaning of 42 U. S. C. Section 1983 and at all relevant times were acting as agents of the State under color of law.

92. As a result of the Defendants' conduct, Mantell is entitled to reinstatement, back pay, restored employment and pension benefits, as well as notice and an opportunity to be heard.

93. As a result of the Defendants' conduct, the individual defendants are, jointly and severally liable, to Mantell for damages and punitive damages in an amount to be established at trial together with all costs and expenses of this action, including reasonable attorney's fees, pursuant to 42 U. S. C. § 1988.

**FOURTH CAUSE OF ACTION**
**(stigma plus, denial of liberty without due process)**

94. Plaintiff repeats and realleges all the foregoing allegations as if set forth herein at length.

95. Upon information and belief, at around the time of her termination, the Defendants publicly made and disseminated generally available statements about Mantell throughout MHLS to the effect that she had engaged in workplace violence and lacked mental stability, and those statements have stigmatized Mantell by calling into question her good name, reputation, honor, and integrity.

96. Upon information and belief, at the time of her termination, the Defendants made public statements and disseminated them throughout MHLS about Mantell's alleged workplace violence and her mental instability that denigrated Mantell's competence as an attorney and impugned her character to such an extent that they have created significant roadblocks to Mantell's ability to practice her profession.

97. As a result of the individual defendants' conduct, Mantell is entitled to a name-clearing hearing or determination, and the individual defendants are jointly and severally liable to Mantell for damages and punitive damages in an amount to be established at trial together with all costs and expenses of this action, including reasonable attorney's fees, pursuant to 42 U. S. C. § 1988. **JURY DEMAND**

98. Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, Plaintiff demands that judgment be entered in her favor and against the Defendants, jointly and severally, for reinstatement with back pay, a promotion to the Principal Attorney position, restored employment and pension benefits and seniority rights; compensatory damages for lost wages, lost benefits, lost enhanced pension benefits and all other forms of lost remuneration; compensatory damages for emotional stress and pain and suffering; punitive damages against all individual defendants; and a name-clearing hearing, the payment of reasonable costs, disbursements and attorney's fees.

Dated: September 17, 2026

*s/Nathaniel B. Smith*

Nathaniel B. Smith
225 Broadway – Suite 1901
New York, New York 10007
212-227-7062
Attorney for Plaintiff